IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION
AT GREENEVILLE

| | |
|---|---|
| SECURITY NATIONAL INSURANCE COMPANY, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No.: 2:13-cv-00081 ) |
| FIRST COMMUNITY CORPORATION and FIRST COMMUNITY BANK OF EAST TENNESSEE, | ) ) ) ) ) |
| Defendant. | ) |

**COMPLAINT FOR DECLARATORY JUDGMENT**

COMES NOW Plaintiff Security National Insurance Company ("Security National"), by and through the undersigned counsel, and hereby brings this Complaint for Declaratory Judgment against First Community Corporation and First Community Bank of East Tennessee Pursuant to 28 U.S.C. § 2201. For its Complaint for Declaratory Judgment, Security National hereby alleges as follows:

**I.  THE PARTIES**

1.  Security National is an entity incorporated under the law of the State of Texas. Security National's principal place of business located in Dallas, Texas. Security National is registered and/or authorized to transact business in the State of Tennessee.

2.  Upon information and belief, First Community Corporation is a entity incorporated under the laws of the State of Tennessee. First Community Corporation's principal office is located in Rogersville, Tennessee. First Community Corporation may be served with

process through its registered agent, Mark A. Gamble, 809 W. Main Street, Rogersville, Tennessee 37857-3652.

3. Upon information and belief, First Community Bank of East Tennessee (the "Bank") is a Tennessee chartered banking corporation with its principal place of business located in Rogersville, Tennessee. The Bank may be served with process through its registered agent, John L. Campbell, 809 W. Main Street, Rogersville, Tennessee 37857-3652.

## II. JURISDICTION AND VENUE

4. This Court has the power to determine the parties' respective rights and other legal obligations as requested herein pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201. The Defendants' demand on Security National, discussed below, creates an actual controversy for this Court to adjudicate.

5. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

6. Venue is proper before this Court pursuant to 28 U.S.C. § 93(b) and 28 U.S.C. § 1391(a) because all relevant actions and transactions to the claim occurred within this judicial district, and because the Defendants are both located within this judicial district.

## III. FACTUAL ALLEGATIONS
### THE POLICY

7. Security National issued Directors and Officers Liability Insurance Policy No. SDO1102270 00 (the "Policy") naming First Community Corporation as insured. A true and

accurate copy of the Policy, along with all declarations, endorsements, and attachments, is attached hereto as **Exhibit 1**.

8. The Policy designates the Bank as an additional Insured under the Policy's Schedule of Subsidiaries.

9. Security National issued the Policy for an effective Policy Period of May 19, 2012 to May 19, 2013 (the "Policy Period").

10. The Policy states that it "**IS A CLAIMS MADE POLICY**" and "**COVERAGE IS LIMITED TO LOSS, INCLUDING DEFENSE EXPENSES RESULTING FROM CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD.**"

11. The Policy also provides that "**THERE IS NO COVERAGE UNDER THIS POLICY FOR CLAIMS THAT HAVE BEEN MADE PRIOR TO THE EFFECTIVE DATE LISTED IN ITEM 2.**"

12. Section III.B of the Policy defines "Claim" (as amended by the DIRECTORS AND OFFICERS CHANGE ENDORSEMENT) to mean:

> 1. a written or oral demand for monetary damages or non-monetary relief, including notice of an arbitration, mediation or other dispute resolution proceeding in which money damages are sought;
> 2. a civil proceeding commenced by the service of a complaint or similar pleading;
> 3. an administrative or regulatory proceeding commenced by the filing of a notice of charges or similar pleading; or
> 4. a criminal proceeding commenced by a return of an indictment.
>
> A **claim** shall be deemed to have been made on the date the **company** or an **insured person** receives the written demand, or on the date that the judicial or administrative proceeding is filed in court or with an administrative agency.
>
> All **claims** involving **interrelated wrongful acts** shall be considered a single **claim** and shall be deemed to have been first made when the earliest **claim** was first made.

13. Insuring Agreement D of the Policy (Company Lender Liability), which is subject to a $2,000,000 Aggregate Limit of Liability and a $25,000 Retention, provides coverage as follows:

> The Insurer will pay on behalf of the **company**, **loss** that is the result of a **claim** for a **lending wrongful act** first made during the **policy period** or during the Extended Reporting Period, if exercised.

14. "Lending Wrongful Act" is defined under section III.S of the Policy (as amended by the BROAD FORM LENDER LIABILITY ENDORSEMENT) as:

> [A]ny actual or alleged, misstatement, misleading statement, error or omission, or neglect or breach of duty by the **company** concerning an extension of credit by the **company**, or an actual or alleged agreement, failure or refusal by the **company** to extend credit. **Lending wrongful act** includes the servicing of loans for others under a contract or agreement.

15. Insuring Agreement E of the Policy (Company Liability), which is subject to a $2,000,000 Aggregate Limit of Liability and a $25,000 Retention, provides coverage for the following:

> The Insurer will pay on behalf of the **company**, **loss** that is a result of a **claim** for a **company wrongful act** first made during the **policy period** or during the Extended Reporting Period, if exercised.

16. "Company Wrongful Act" is defined by Section III.D of the Policy as:

> [A]ny actual or alleged, misstatement, misleading statement, error or omission, or neglect or breach of duty by the **company**.

17. Section III.C of the Policy defines "Company" as:

> **Company** means the **parent company** and any **subsidiary**.

18. Section III.T of the Policy defines "Loss" to mean:

710840.1

4

Case 2:13-cv-00081-JRG-DHI   Document 1   Filed 03/13/13   Page 4 of 18   PageID #: 4

[A]ny amount which any **insured person** or the **company** is legally obligated to pay as a result of a **claim**, and includes punitive, exemplary or multiple damages in excess of actual damages (except where uninsurable under applicable law), other damages, judgments, settlements and reasonable defense expenses. Loss shall not include:

1. taxes;
2. criminal or civil fines or penalties imposed by law;
3. any unpaid, unrecoverable or outstanding loan, lease or extension of credit to any customer or any forgiveness of debt;
4. costs to comply with any non-monetary or injunctive relief of any kind or any agreement to provide such relief, including but not limited to any damages, costs or expenses incurred in making an accommodation for any disabled person pursuant to the Americans with Disabilities Act or any similar federal, state or local laws, or in complying with any other federal, state or local laws of any kind;
5. any amounts the **company** is obligated to pay pursuant to any express written or oral contract or agreement existing prior to the date the **claim** was made;
6. the depreciation (or failure to appreciate) in value of any investment product, including but not limited to securities, commodities, currencies, options or futures due to market fluctuation;
7. any restitution, disgorgement, or payment of similar payments including but not limited to the return of fees, commissions or charges for the **company's** services; or
8. any matters which are uninsurable under the law pursuant to which this policy shall be construed.

Where the **company** reasonably determines that punitive, exemplary or multiple damages are insurable under the applicable law, the Insurer shall not challenge that interpretation of insurability.

19. Exclusion IV.A.1 of the Policy excludes coverage as follows:

The Insurer shall not be liable to make any payment for **loss** in connection with any **claim** based upon, arising out of, relating to, in consequence of, or in any way involving:

1. any **claim** first made prior to the effective date of **policy period**, shown in Item 2. of the Declarations;

20. Exclusion IV.A.7 excludes coverage for:

[A]ny fraudulent, dishonest or criminal actions of an **insured person** or the **company.** However, the **insured** person or the **company** shall be indemnified for **defense expenses** as to any **claim** alleging such fraudulent, dishonest or criminal actions, unless a judgment or final adjudication establishes such fraudulent, dishonest or criminal acts or if such acts are otherwise established in fact. In the event that the Insurer has no liability, the **insured person** or the **company** agrees to repay to the Insurer, upon demand, all monies advanced by the Insurer in connection with such **claim**.

21. Exclusion IV.A.8 similarly excludes coverage for:

[T]he willful failure to comply with any law or any governmental or administrative order or regulation by the **company** or an **insured person** or with the consent of the **company** or an **insured person**. For the purposes of this exclusion, "willful" means acting with reckless disregard of such laws, orders or regulations. However, the **insured person** or the **company** shall be indemnified for **defense expenses** as to any **claim** alleging such willful failure unless a judgment or final adjudication establishes such willful failure or if such willful failure is otherwise established in fact. In the event that the Insurer has no liability, the **insured person** and the **company** agree to repay to the Insurer, upon demand, all monies advanced by the Insurer in connection with such **claim**.

22. Exclusion IV.A.21 of the Policy excludes coverage for the following:

[U]nderwriting, syndicating, securitizing, market making, promoting, or otherwise participating in or providing services in connection with any merger, acquisition, divestiture, tender offer, proxy contest, leveraged buyout, "going private" transaction, spin-off, offering of debt securities or equity securities, bankruptcy proceeding, reorganization, capital restructuring or recapitalization, dissolution or sale of all (or substantially all) of the assets or stock of any entity, effort to provide capital or financing for any enterprise or entity, the rendering of any fairness opinion (except in connection with the **company's** administration of any customer account), any disclosure requirements in connection with any of the foregoing, or any representation, guarantee or warranty provided by or on behalf of the **company** in connection with any of the foregoing; however, this exclusion shall apply only to any such transaction or event by or on behalf of a customer, prospective customer or client of the **company**.

23. Section VII.D of the Policy states:

> If a **claim** is covered under more than one insuring agreement, then the Insurer's maximum Limit of Liability shall be limited to the highest Aggregate Limit of Liability providing coverage for such **loss** and only the retention of that insuring agreement shall apply. The Aggregate Limit of Liability and the retention for **public relations expenses** and **customer privacy expenses** shall apply to said coverages and not the Aggregate Limit of Liability or the retention of the insuring agreement with the highest Aggregate Limit of Liability providing coverage.

24. Section VIII.B of the Policy states, in relevant part:

> As a condition of any advance payments for **defense expenses** the **insured persons** or the **company** agree to repay to the Insurer any **defense expenses** that are advanced if it is established that any such **defense expenses** are not covered under this policy.

## THE DEMAND FOR COVERAGE

25. On October 1, 2012, Rohit Majethia ("Majethia") and OM Ganeshaya Namaha, LLC ("OM") filed a Complaint in the Circuit Court for Washington County, Tennessee naming Shri Yogeshwar-Johnson City, G.P. ("Shri Yogeshwar"), Satis D. Patel ("Patel"), and the Bank as Defendants (the "Majethia Complaint"). A true and accurate copy of the Majethia Complaint is attached hereto as **Exhibit 2**.

26. As stated more fully therein, the Majethia Complaint arises from the Bank's alleged promotion of, participation in, or services provided by the Bank in conjunction with the sale by Shri Yogeshwar and Patel (and acquisition by Majethia and OM) of a Quality Inn & Suites located in Johnson City, Tennessee (the "Hotel Property").

27. An email dated September 1, 2010 from Ed Brading (the Bank's closing attorney) to Jim Rudeau with Choice Hotels International, Inc. describes the transaction as follows:

> I represent First Community Bank of East Tennessee. The bank holds the current mortgage on the hotel to secure it loan to Shri Yogeshwar - Johnson City General Partnership, the current owner. That loan is in default. Rather than exercise its foreclosure rights or other remedies, the bank is in the process of making a loan to Rohit (Ray) Majethia or his assigns, which may include OM Ganeshaya Namaha, LLC, to enable Mr. Majethia to buy and operate the hotel. The bank's aim is to get into place a new, performing loan on the property.
>
> Ray Majethia is an experienced hotel operator. There is no business relationship on this property, or so far as I know on any other property, between Mr. Majethia and Shri Yogeshwar or its principal, Satis Patel. Because of the current obligation on the hotel, unpaid real estate taxes, and loan-to-value restrictions, no net sale proceeds are expected.
>
> The bank's concern, which is also the concern of Mr. Majethia, is that the fees that Choice is requiring to be paid as a condition of relicensing will exceed both the loan and Mr. Majethia's ability to repay. You have explained to me that there are two sorts of Choice fees. One sort is the past due portion owing to Choice from the current owner. The other sort is a fee, $36,000, payable in order for a franchise to be purchased.
>
> The bank and Mr. Majethia would like to negotiate the amounts of these fees, particularly the first sort. As I have mentioned, there is no business relationship between Mr. Majethia and the current owner, and no net sale proceeds are expected. If there were any net proceeds, they could be made payable to Choice from the closing.

A true and accurate copy of this email is attached hereto as **Exhibit 3**.

28. The Majethia Complaint avers that the Bank contacted the Majethias in May 2010 about the opportunity to acquire the Hotel Property. It states:

> 7. Prior to May of 2010, both Rohit and Parul Majethia owned and operated the Ramada Ltd. Hotel in Johnson City, Tennessee (the "Ramada Hotel"). The Ramada Hotel was financed through [the Bank], and Jerry Green[1] was the Chief Operating Officer at [the Bank] at that time. During the purchase and subsequent sale of the Ramada Hotel by the Majethias, Jerry Green assisted Mr. and Mrs. Majethia with all financial aspects of

---

[1] Throughout the Majethia Complaint, the name Jerry Greene is spelled "Green." Upon information and belief, the accurate spelling of Jerry Greene's name is "Greene."

the property. After the sale of the Ramada Hotel in 2008, Jerry Green and Mr. Majethia remained in contact and maintained a pleasant relationship with each other.

> 8. In May of 2010, Jerry Green contacted Mr. Majethia and discussed the prospects of purchasing the Hotel Property. During their discussions, Mr. Majethia advised Jerry Green that he currently did not have the money to purchase the Hotel Property, but Jerry Green persuaded Mr. Majethia to contact Patel and inquire into the purchase.
>
> 9. In June of 2010, Jerry Green contacted Mr. Majethia via email asking if he had made any progress with Patel and whether they had come up with an agreement. Jerry Green advised that if an agreement was not reached then the Hotel Property would likely go into foreclosure.

29. The Majethia Complaint states that Majethia and Patel reached an agreement in June 2010 for Majethia to purchase the Hotel Property from Patel, and the Bank agreed to finance Majethia's purchase of the Hotel Property. In that regard, the Majethia Complaint states:

> 10. Shortly thereafter, Mr. Majethia and Patel agreed on a purchase price for the Hotel Property and, from June 22 through July 15 of 2010, both parties discussed the specific terms of the transaction. Specifically, on June 25, 2010, Mr. Majethia forwarded a Letter of Intent to Patel and Shri Yogeshwar (the "Letter of Intent"). . . . Among other things, the Letter of Intent provided for the expression of interest for the potential purchase of the Hotel Property and for certain due diligence items including: (i) approval from [the Bank] for the proposed assumption of the current loan balance at 6% amortized over the current term with a 5-year call and (ii) the transfer of the license agreement (the "Franchise Agreement") with Choice Hotel International ("Choice Hotels").
>
> 11. On June 30, 2010, an email was sent to Jerry Green in which Mr. Majethia's intent to purchase the Hotel Property was outlined. Among other things, Mr. Majethia made it clear that, in order to effectuate the closing, Patel needed to be current in all respects with regard to the unpaid and outstanding bills for Choice Hotels and the Hotel Property. Jerry Green, as an agent of [the Bank], responded that the only issue that he could foresee was the interest rate which Mr. Majethia was attempting to procure through [the Bank] to finance the purchase of the Hotel Property.

> 12. On July 19, 2010, a Purchase and Sale Agreement was executed by Mr. Majethia and Shri Yogeshwar (the "Purchase Agreement"). Among other things, the Purchase Agreement provided for the sale and transfer of the Hotel to the Purchaser. In addition, the Purchase Agreement provided for certain due diligence items including: (1) loan approval from [the Bank] and (2) transfer of the franchise agreement with Choice Hotels. . . . Subsequently, Mr. Majethia paid a $200,000.00 earnest money deposit (the "Deposit") towards the purchase of the Hotel Property.
>
> 13. On August 5, 2010, [the Bank] provided a Letter of Commitment to Mr. and Mrs. Majethia (or an entity to be determined) to finance the purchase of the Hotel Property.

30. According to the Majethia Complaint, an issue regarding unpaid franchise fees that were due to Choice Hotels, the franchisor for the Quality Inn & Suites, became a potential barrier to completing the transaction. However, the Majethia Complaint alleges that Greene persuaded Majethia that the fees would be paid and that he should follow through on the deal. The Majethia Complaint states:

> 14. From mid-July through mid-August of 2010, Mr. Majethia conducted due diligence with regard to the Hotel Property. During this period, Mr. Majethia discovered that several bills were unpaid including, but not limited to, those pertaining to taxes, food and supply vendors and travel agent commissions. In addition, the Choice Hotels royalty dues were unpaid (the "Choice Hotels Unpaid Invoice").
>
> 15. Upon discovering this information, Mr. Majethia contacted Jerry Green of [the Bank] and voiced his concerns. Jerry Green, acting as an agent for [the Bank], assured Mr. Majethia that these issues would be resolved prior to closing and advised that if he backed out of the transaction then he would lose the Deposit given that the loan from [the Bank] had been approved and the Franchise Agreement with Choice Hotels would be transferred.
>
> 16. Based upon these representations and assurances, Mr. Majethia proceeded with the transaction to purchase the Hotel Property.

31. The Majethia Complaint alleges that despite assurances by Greene, the franchising fees remained outstanding:

> 17. On August 9, 2010, Choice Hotels removed the Quality Inn from its reservation system as a result of the nonpayment of Choice Hotels Unpaid Invoice. At this point, the flag of the hotel remained but it did not have access to any direct outside reservations.
>
> 18. On August 10, 2010, an appraisal was ordered by [the Bank] for the Hotel Property. Among other things, the appraisal was based upon an income approach which factored in the three year revenue average for the Hotel Property. The Hotel Property appraised for $4,140,000.00.
>
> 19. In mid-August, Mr. Majethia sent an email to Choice Hotels expressing his concern with regard to the suspended reservation system. Throughout this process, the Defendants were aware of the issues pertaining to the Choice Hotels Unpaid Invoice but they, nonetheless, assured Mr. Majethia that the issue would be resolved prior to the closing.
>
> 20. On September 1, 2010, several emails were exchanged between Choice Hotels, Patel, [the Bank] and Mr. Majethia with regard to unpaid invoices. Among other things, those emails indicated that the Choice Hotels Unpaid Invoice in the amount of $80,000.00 needed to be paid to convey the Quality Inn hotel flag and that the Choice Hotels Unpaid Invoice would be paid with any surplus funds remaining at closing.
>
> 21. On the same date, Mr. Majethia expressed his concerns with Jerry Green at [the Bank] and requested a payment deferral until the issues with Choice Hotels could be resolved. Jerry Green, acting as an agent of [the Bank], responded that everything, including payment of the Choice Hotels Unpaid Invoice, would be resolved and that he expected Mr. Majethia to honor the Purchase Agreement.

32. According to the Majethia Complaint, the parties closed the sale and transfer of the Hotel Property in September 2010, but the Choice Hotels franchising fees were not resolved:

> 22. On September 27, 2010, a preliminary HUD Statement was sent to Mr. Majethia and Patel for review. Upon

> review, Mr. Majethia noticed that there was not a line item for payment of the Choice Hotels Unpaid Invoice.
>
> 23. On September 28, 2010, an email was sent from Ed Brading, closing attorney for [the Bank], to Patel, Jerry Green and Mr. Majetrua which indicated that he needed to make an adjustment on the closing statement to pay the Choice Hotels Unpaid Invoice and requested direction as to how it should be allocated between the buyer and seller. A reply was sent by Patel indicating that he was not responsible, but no response was sent to Mr. Majethia from the closing attorney or [the Bank] as to a final determination with regard to the Choice Hotels Unpaid Invoice.
>
> 24. On September 29, 2010, the parties attended the closing with regard to the purchase of the Hotel Property; however, no line item was included which referenced the payment of the Choice Hotel Unpaid Invoice. At this stage, Mr. Majethia was under the impression that the issue had been resolved given the prior emails as well as the previous representations from Jerry Green and [the Bank] that the issue would be resolved prior to closing.
>
> 25. On September 30, 2010, Mr. Majethia received copies of all loan documentation which specifically referenced the closing of the *"$2,300,000.00 loan secured by the Quality Inn & Suites."*

33. The Majethia Complaint alleges that on October 1, 2010, Choice Hotels withdrew its offer to transfer the "flag" of the Quality Inn to Majethia, and subsequently directed Majethia to remove all Quality Inn signage and supplies from the Hotel Property.

34. The Majethia Complaint further alleges that in January 2012, an appraisal of the Hotel Property was conducted and valued the Hotel Property at $2,700,000, which was a reduction of $1,440,000 from the pre-closing appraisal of $4,140,000.

35. The Majethia Complaint states that when Majethia inquired as to the decline in value, the Bank told him that a Motel 6 is less valuable than a Quality Inn & Suites and that Majethia's revenue was thirty percent (30%) less than the Bank expected had the Hotel Property stayed a Quality Inn & Suites.

36. The Majethia Complaint asserts causes of action against the Bank for: (1) promissory fraud, (2) fraudulent concealment, (3) negligent misrepresentation.

37. Count III of the Majethia Complaint for Promissory Fraud alleges as follows:

> 39. Defendants supplied false information to Plaintiffs regarding the purchase of the Hotel Property and the transfer of the Choice Hotels Franchise Agreement. Specifically, Defendants misrepresented, among other things, that the Choice Hotels Unpaid Invoice would be resolved prior to closing. Defendants' representations and assurances embodied a promise of future action without the present intent to carry it out especially in light of the fact that the Defendants were aware that Shri Yogeshwar and Patel assigned the Franchise Agreement to Dadaji, Inc. These representations were later used for the financial benefit of the Defendants. Defendants communicated said information with scienter. Plaintiffs justifiably relied upon the misrepresentations by executing the Purchase Agreement and continuing a business relationship with the Defendants.
>
> 40. As a direct, proximate and foreseeable result of the Defendants' misrepresentations, Plaintiffs have suffered damages including, but not limited to, loss of the value of their property, lost opportunity to generate revenue as a result of the removal of the Quality Inn hotel flag and other direct and indirect consequential damages in an amount to be proven at trial. In addition, because the actions of the Defendants were intentional, deliberate and willful, Plaintiffs are also entitled to punitive damages in an amount to be proven at trial.

38. Count IV of the Majethia Complaint for Fraudulent Concealment alleges the following against the Bank:

> 42. [The Bank] fraudulently concealed important information with regard to the purchase of the Hotel Property. Specifically, among other things, [the Bank] concealed that the Choice Hotels Unpaid Invoice was not resolved prior to closing even though there was ample opportunity to notify the Plaintiffs of the issues pertaining to same.
>
> 43. Given the prior relationship between Jerry Green and Mr. Majethia, [the Bank] knew or had reason to know Mr. Majethia reposed trust and confidence in [the Bank] with regard to the purchase of the Hotel Property. [The Bank], however, used

> Plaintiffs' trust and confidence to its advantage in an effort to encourage the Plaintiffs' purchase of the Hotel Property which, in turn, ultimately benefited [the Bank's] financial portfolio.
>
> 44. As a direct, proximate and foreseeable result of the [the Bank's] concealment, Plaintiffs have suffered damages including, but not limited to, loss of the value of their property, lost opportunity to generate revenue as a result of the removal of the Quality Inn hotel flag and other direct and indirect consequential damages in an amount to be proven at trial. In addition, because the actions of [the Bank] were intentional, deliberate and willful, Plaintiffs are also entitled to punitive damages in an amount to be proven at trial.

39. Finally, Count V of the Majethia Complaint for Negligent Misrepresentation alleges:

> 46. [The Bank] supplied false information to Plaintiffs regarding the purchase of the Hotel Property and the transfer of the Choice Hotels Franchise Agreement. Specifically, [the Bank] misrepresented, among other things, that the Choice Hotels Unpaid Invoice would be resolved prior to closing. [The Bank] supplied the false information for the guidance of Plaintiffs in conducting their business transactions. [The Bank] failed to exercise reasonable care in communicating the information and Plaintiffs justifiable [sic] relied upon the information communicated by [the Bank] in purchasing the Hotel Property and continuing a business relationship with [the Bank].
>
> 47. As a direct, proximate and foreseeable result of First Community Bank's misrepresentations, Plaintiffs have suffered damages including, but not limited to, loss of the value of their property, lost opportunity to generate revenue as a result of the removal of the Quality Inn hotel flag and other direct and indirect consequential damages in an amount to be proven at trial.

40. The Majethia Complaint seeks an award against the Bank for compensatory and punitive damages, consequential and special damages for the loss of value to the Hotel Property and lost opportunity to generate revenue as a consequence of loss of the Quality Inn & Suites hotel flag, attorneys' fees, costs, and prejudgment interest.

41. In a letter to the Bank dated February 11, 2013, Security National agreed to, *inter alia*, advance Defense Expenses under a full reservation of rights with regard to the Majethia Complaint. A true and accurate copy of this letter is attached hereto as **Exhibit 4**.

42. Security National continues to fully reserve any and all rights, remedies, and defenses at law, in equity, and under the Policy and its endorsements in relation to the Majethia Complaint.

43. Security National's filing of this Complaint is not intended to waive any rights, remedies, or defense to coverage under the Policy with regard to the Majethia Complaint.

44. Additional conditions, limitations, and exclusions may exclude or limit coverage for the Defendants with regard to the Majethia Complaint.

## COUNT I – DECLARATORY JUDGMENT

45. Security National hereby incorporates by reference the allegations contained in Paragraphs 1 through 44 of this Complaint as if set forth fully herein.

46. Security National is entitled to a judicial declaration of rights and obligations under the Policy, if any, with regard to the Majethia Complaint.

47. Security National is entitled to a judicial declaration that it has no obligation to the Bank, under the Policy or otherwise, with regard to the Majethia Complaint.

48. Based upon the allegations of the Majethia Complaint, coverage for the Majethia Complaint is excluded under Exclusion IV.A.21.

49. The allegations of the Majethia Complaint establish that the Bank promoted, otherwise participated in, or provided services in connection with an acquisition, a dissolution or sale of all (or substantially all) of the assets or stock of any entity, or an effort to provide

capital or financing for any enterprise or entity by or on behalf of a customer, prospective customer or client of the Bank.

50. Additionally, upon information and belief, Majethia and/or OM may have made a written or oral demand for monetary damages or non-monetary relief prior to the Policy Period.

51. To the extent the Court finds evidence that a Claim was first made against the Bank prior to the May 19, 2012 effective date of the Policy Period, coverage for the Majethia Complaint is excluded under Exclusion IV.A.1.

52. The Majethia Complaint asserts causes of action for promissory fraud, fraudulent concealment, and misrepresentation.

53. To the extent the Court finds evidence that the Bank committed any fraudulent, dishonest or criminal actions, coverage under the Policy is excluded under Exclusion IV.A.7.

54. To the extent the Court finds evidence that the Bank willfully failed to comply with any law or any governmental or administrative order or regulation, coverage under the Policy is excluded under Exclusion IV.A.8.

55. Additional conditions, limitations, and exclusions may exclude or limit coverage for the Defendants with regard to the Majethia Complaint.

## COUNT II – REIMBURSEMENT OF DEFENSE EXPENSES

56. Security National hereby incorporates by reference the allegations contained in Paragraphs 1 through 44 of this Complaint as if set forth fully herein.

57. Any coverage under the Policy is subject to a single $2,000,000 limit of liability and a single $25,000 self-insured retention.

58. Security National has agreed to advance Defense Expenses with regard to the Complaint, under a full reservation of rights, pending an adjudication by this Court as to whether coverage is excluded or otherwise not implicated under the Policy.

59. If it is determined that coverage is excluded or otherwise not implicated, Security National is entitled to a return of all Defense Expenses advanced pursuant to Section VIII.B.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Security National respectfully requests the following relief:

a. That the proper process be issued and that the Defendants be required to answer this Complaint in the time prescribed to them by law;

b. That the Court enter an Order declaring that coverage is excluded or otherwise not implicated with regard to the Majethia Complaint;

c. That the Court enter an Order requiring the Defendants to reimburse all Defense Expenses advanced by Security National, pursuant to Section VIII.B of the Policy; and

d. For such further relief as this Court deems just and proper.

Respectfully submitted,

/s/ Jeffrey S. Price
Jeffrey S. Price        TN Bar No. 19950
MANIER & HEROD
150 Fourth Avenue North, Suite 2200
Nashville, TN 37219
Phone: (615) 244-0030
Fax: (615) 242-4203
JPrice@manierherod.com

*Attorney for Plaintiff Security National Insurance Company*